**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

———————————————————————

BRUNCE SMITH      **Plaintiff(s)**

vs.

BRAIN FISCHER, J. SAUNDERS,
J. ROSATI      **Defendant(s)**

———————————————————————

)
)
)
)
)
)
)
)
)

U.S. DISTRICT COURT - N.D. OF N.Y.

**FILED**

APR 1 7 2014

At _____ O'CLOCK
Lawrence K. Baerman, Clerk - Syracuse

**INMATE**
**CIVIL RIGHTS**
**COMPLAINT PURSUANT**
**PURSUANT TO**
**42 U.S.C. § 1983**

Case No. 9: _14_ cv _440_

---

Plaintiff(s) demand(s) a trial by: ✓ JURY _____ COURT   (Select **only** one).

---

Plaintiff(s) in the above-captioned action, allege(s) as follows:

## JURISDICTION

1.     This is a civil action seeking relief and/or damages to defend and protect the rights guaranteed by the Constitution of the United States. This action is brought pursuant to 42 U.S.C. § 1983. The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343(3) and (4) and 2201.

## PARTIES

2.     Plaintiff: BRUNCE SMITH

    Address: Clinton Correction Facility

        Box 2001

        Dannemora NY. 12929

Additional Plaintiffs may be added on a separate sheet of paper.

3.     a.     Defendant: BRAIN FISCHER

        Official Position: Commissioner DOC's

        Address: Department Of Correction Service

            1220 Washington Ave

            Albany NY 12224

b.   Defendant:   J SAUNDERS

Official Position:   CORRECTION OFFICER

Address:   GreatMeadow Correction Facility

Box 51

Comstock NY 12821

c.   Defendant:   J. Rosati

Official Position:   CORRECTION Officer

Address:   Box 51, GreatMeadow Correction

Facility

Comstock NY 12821

Additional Defendants may be added on a separate sheet of paper.

4.  PLACE OF PRESENT CONFINEMENT

a.   Is there a prisoner grievance procedure at this facility?

   __√__ Yes          _____ No

b.   If your answer ro 4a is YES, did you present the facts relating to your complaint in this grievance program?

   __√__ Yes          _____ No

If your answer to 4b is YES,

(i)   What steps did you take?   Submitted A GrievAnce

_____

_____

(ii)   What was the final result of your grievance?   _____

UnAimously Accepted in pArt

If your answer to 4b is NO - why did you choose to not present the facts relating to your complaint in the prison's grievance program? _____

_____

_____

c.    If there is no grievance procedure in your institution, did you complain to prison authorities about the facts alleged in your complaint?

_____ Yes          _____ No

If your answer to 4c is YES,

(i)    What steps did you take? _____

_____

_____

(ii)    What was the final result regarding your complaint?_____

_____

If your answer to 4c is NO - why did you choose to not complain about the facts relating to your complaint in such prison? _____

_____

5.    **PREVIOUS LAWSUITS**

a.    Have you ever filed any other lawsuits in any state and federal court relating to your imprisonment?

___✓___ Yes          _____ No

b.    If your answer to 5a is YES you must describe any and all lawsuits, currently pending or closed, in the space provided below.

For EACH lawsuit, provide the following information:

i.    Parties to previous lawsuit:

Plaintiff(s): ___Brunce Smith_____

Defendant(s): ___Pilgrim State Corr Fac_____

ii.    Court (if federal court, name District; if state court, name County):

EAstern District NY

iii.   Docket number: _____

iv.    Name of Judge to whom case was assigned: _____

v.     Disposition (dismissed? on appeal? currently pending?): Settled

vi.    Approximate date of filing prior lawsuit: 1983

vii.   Approximate date of disposition: Settled in 1985

6.                                    **FACTS**

Set forth the facts of your case which substantiate your claim of violation of your civil and/or Constitutional rights.  List the events in the order they happened, naming defendants involved, dates and places.

**Note: You must include allegations of wrongful conduct as to EACH and EVERY**
**     defendant in your complaint.**  (You may use additional sheets as necessary).

On September 13, 2011 at approximately 10. Am A mentally ill Sheppard was being escorted by A correction Officer on B Company C Block in Great Meadow Correction Facility. The officer ordered Sheppard to walk faster And pushed the prisoner causing him to fall. The officer begun to strike Sheppard with closed fist while the prisoner layed on the ground. Within a minute several officers jointed in on the assault.

Officer Saunders notice plaintiff watching the assault from 20 cell and ordered plaintiff to sit at the other end of his bed. Officer Rosati then told the plaintiff that we take care of witnesses at Comstock.

Parties to previous lawsuit:

Plaintiff(s) Bruce Smith

Defendant(s) Riverhead County Jail

Court (if federal court, name District, if state court County):
   Eastern District NY

   Docket number:

Name of Judge to whom case assigned:

Disposition (dismissed? on appeal? currently pending?) settled

Approximate date of filing prior lawsuit   1984

   Approximate date of disposition              1992


Parties Previous lawsuit

Plaintiff(s) Bruce Smith

Defendant(s) Rikers Island

Court (if federal court, name District, if state court county) Southern

Docket Number

Name of Judge to whom case was assigned:

Disposition (dismissed? on appeal? currently pending?) Settled

   Approximate date of filing prior lawsuit   1998

Approximate date of disposition              July 2001


Parties to Previous lawsuit:

   Plaintiff(s) Commissioner Goord, Captain Kearn

Court (if federal court, name District, if court County):

   Western District NY

   Docket Number

Name of Judge to whom case was assigned:

Disposition (dismissed? on appeal? currently pending?) dismissed
Approximate date of filing prior lawsuit      2001
approximate date of disposition                 2001


Parties to Previous lawsuit
Plaintiff(s) Bernice Smith
Defendant(s) Correction Officer
Court (if federal court, name district, if state County)
   Court of Claim, Chemung County
Docket number
Name of Judge to whom case was Assigned
Disposition (dismissed? on appeal? currently pending?) dismissed
Approximate date of filing prior lawsuit      2006
Approximate date of disposition                 2003


Parties to Previous lawsuit
Plaintiff(s) Bernice Smith
Defendant(s) Brian Fischer, D Venettozzi, Joseph Wolczyk
Court (if federal court, name district, if state county) Northern
Docket number # 9:12-cv-0097
Name of Judge to whom case was assigned Mae A. D'Agostino
   David E. Peebles
Disposition (dismiss? on appeal? currently pending) pending
Approximate date of filing prior lawsuit    6/20/2012
Approximate date of disposition               pending

When the prisoners on B company were let out for the noon chow Correction officer Saunder was waiting between C and D block with blue leather gloves on. Plaintiff walked past officer Saunder with other prisoners and notice several officers standing on the stairs leading up to 2 & 7 company in C Block. Officer Saunder shouted out "thats him in the brown shirt" and officer Rosati caught up with plaintiff.

Officer Rosati ordered plaintiff to place his hands on the bars of 1 company control booth. Officer Rosati then punched plaintiff on the right side of his face. When the plaintiff turned he saw several correction officers included Saunders throwing punches. Plaintiff was forced to the floor and the assault continue. Sergeant Kline who was the area supervisor from the assault on prisoner Shepperd stood and watched. More officers joined in and kicked, punched and hit the plaintiff with batons about the face, head and body.

Plaintiff was placed in handcuff and leg irons and taken to the facility hospital where he stayed for a week due to injuries. While still in the hospital a tier / tier / there hearing was held and plaintiff was found guilty of assault, direct order violent conduct, contraband, frisk procedures. Plaintiff served 22 months in complete isolation where he was denied the same programs, visits, personal property and treatment afforded to regular population.

During orientation class in April 2011 Correction counselor John Scroggy and a Lieutenant warned Approximately 35 prisoners that the correction officers at Great Meadow have a long history of assaulting prisoners and will not tolerate any nonsense. Correction counselor Scroggy emphasized several time that Great Meadow staff has a pattern and practice of assaulting prisoners and to be careful not to cause a problem with staff while at Great Meadow.

Back in 1989 during Admission under Fed R Evid 801 (d)(2)(A) Commissioner Coughlin Admitted Knowing correction officers generally adhere to a "code of silence and lie to conceal officers assault on prisoners". Commissioner Brain Fischer Allowed this same practice where groups of all white officers maliciously and sadisically Assault African American prisoners at Great Meadow, Attica and Clinton Correction Facilities

At the time of Plaintiff Assault there were only two African American Officers employed at Great Meadow out of a staff of several hundred officers.

Submitted with the complaint is a Report of the finding by Correctional Association of New York based on a surveys conversations with staff and inmates conducted back in 2006 at Great Meadow.

On page 10 and 11 of Exhibit # 1 from
The Correctional Association of New York
report findings prisoners spoke of their experience
And knowledge on staff behavior towards prisoners.
Prisoners spoke of how the staff were disrespectful
abusive and provocative while being assaultive in the
cellblock, sergeants office. According to this report
prisoners assaults are more likely to occur in certain
areas. Inmates who witnesses incidents of abuse are
sometimes intimidated from testifying on a other inmate
behalf while Supervisors routinely support the officers
versions of the incident and file paperwork to mirror
the officers reports without adequately investigating the
inmates claim.

Commissioner Fischer is being sued in his
individual capacity for violating the plaintiff eight
amendment to be free from cruel and unusual punishment as
well as prison officials. Commissioner Fischer knows of the
pattern practice of excessive force being used by correction
officers in various prisons and never curved this practice.

Correction Officer Saunders is being sued in his
individual capacity for violating the plaintiff eight amendment
rights to be secure in ones person and free from assault
and sadistic use of force.

Correction officer Rosati is being sued in his
individual capacity for unprovokingly causing physical
harm to plaintiff

J Rosati maliciously and sadisticly
assaulted plaintiff which is a violation of
the eight amendment.

7.                              **CAUSES OF ACTION**

**Note: You must clearly state each cause of action you assert in this lawsuit.**

### FIRST CAUSE OF ACTION

When prison officials maliciously and sadisically use force to cause harm to plaintiff contemporary standard of deceny violated the eight amendment claim for use of excessive force

### SECOND CAUSE OF ACTION

### THIRD CAUSE OF ACTION

8.    **PRAYER FOR RELIEF**

**WHEREFORE,** plaintiff(s) request(s) that this Court grant the following relief:

Plaintiff Request money Relief

I declare under penalty of perjury that the foregoing is true and correct.

DATED:    4-1-14

Brunce Smith

Signature of Plaintiff(s)
(all Plaintiffs must sign)

02/2010

Verification

State of New York ) ss
County of Clinton )

Brunce Smith Being duly sworn, deposes And
says that deponent is the Plaintiff in the within
action; that deponent has read forgoing complaint
And Knows the contents there of, that the same is
true to deponent own Knowledge; except As to matters
therein stated to be alleged upon information And
belief And that As to those matter, deponent beliefs
it to be true.

Brunce Smith

Brunce Smith pro se

Sworn to me this 8 day
of _____ And _____ 2014

Notary Public
Herb H. Durgan
Notary Public, State of New York
No. 01DU6008379
Qualified in Clinton County
Commission Expires 6/8/14

# The Correctional Association of New York

FOUNDED 1844

135 EAST 15th STREET, NEW YORK, N.Y. 10003 • (212) 254-5700 • Fax (212) 473-2807 • www.correctionalassociation.org

## Great Meadow Correctional Facility

Great Meadow Correctional Facility is a maximum security prison for men, located in Comstock, New York. The prison includes a Special Housing Unit confining inmates in disciplinary segregation, a Behavioral Health Unit for inmates with long term disciplinary and mental health problems, an Alcohol and Substance Abuse Treatment Program and a variety of educational, vocational and treatment programs. The Correctional Association's visit to the facility was on June 20, 2006.

Members of the Correctional Association's Prison Visiting Committee conducted surveys, in-person and through the mail, with 127 Great Meadow inmates throughout the facility. We have based this report on findings from these surveys, conversations with staff and inmates, correspondence with inmates and a meeting with the Inmate Liaison Committee and the inmate representatives on the Inmate Grievance Resolution Committee.

Overall, the Visiting Committee was struck with both positive and negative impressions of Great Meadow. Throughout the day, we heard of widespread tension between inmates and staff and extensive complaints about medical services. We were, however, encouraged by the administration's support for program enhancements, as well as some positive aspects of the educational and vocational programs. In addition, we were favorably impressed with mental health services in the Intermediate Care Program.

At the time of our visit, Great Meadow confined 1,646 inmates, 80% of whom were convicted of a violent crime. Over half the population had been at the prison for less than one year and nearly half the inmates have six or more years to serve before reaching their earliest possible release date. According to the Department of Correctional Services (DOCS), 54% of Great Meadow's inmates are African-American, 24% are Latino and 19% are white. Inmates filed 2,364 grievances in 2005, a 10% increase from 2004 when 2,130 were filed. With 444 grievances, medical services was the area about which inmates filed the most complaints. Housing-internal block affairs received a significant number of grievances, with 219, and staff misconduct received 192.

The following is a summary of the Committee's observations and recommendations.

## Medical Care

We received numerous complaints from the inmates we interviewed about the quality of the medical care at the prison. Overall, 58% of our survey respondents rated the care as poor, 35% considered it fair and only 7% described it as good. As we mentioned, grievances about

- 1 -

medical care are also very high. In 2004, inmates filed 504 medical grievances, representing 24% of all grievances that year, a rate much higher than at other prisons we have visited. In addition, the 444 grievances in 2005 constituted 19% of all of that year's grievances, and we were informed at the time of our visit in June that approximately 300 medical grievances had already been submitted for this year. This high level of inmate discontent with healthcare appears to be based both on inadequate medical resources and the poor quality of care the inmates receive once they see a provider.

During our visit, we met with Dr. Paolano, who has been the Facility Health Services Director (FHSD) for several years. We appreciate his candid discussion of the medical care services and the useful information he provided about the healthcare system at the prison. Staffing has been a problem for the Great Meadow medical unit for some time, dating back at least to our visit in 2002. There are three physicians, two of whom are half time, and one physician's assistant (PA), a staffing pattern that has remained fixed for several years. With the opening of the Behavior Health Unit (BHU), the prison requested an additional half-time physician to provide the increased medical services required by BHU inmates, but that item has not yet been approved. Given the reported delays in access to providers, additional clinical services should be offered to meet the needs of the entire prison population.

The prison is authorized to have 14 nurses, but there are four nurse vacancies, representing 29% of the nursing staff. We were informed that nursing vacancies have persisted for two years and that the low salary for nurses for this region of the state pursuant to the civil service pay schedule has made it difficult to recruit replacements. To cover these vacancies, the prison has used extensive overtime, some extra-service nurses and per diem nurses on the weekends. Using such methods to fill in for a chronic nursing shortage causes lapses in continuity of care, creates excessive stress on the existing staff, can result in disruption in essential services and is financially wasteful. The FHSD acknowledged that there has been significant turnover in the prison medical staff. It is clear that these vacancies have had a deleterious effect on the provision of medical care at the prison. Making matters worse, is that the prison is also missing a permanent Nurse Administrator (NA). Although there has been a nurse temporarily assigned to the NA position, it is our understanding that the prison is still looking for a replacement. Given the nursing vacancies, the NA's role is even more important. Failure to permanently fill this position has contributed to the inability of the medical unit to organize and implement staff training, to monitor care, to respond in a timely manner to inmate complaints about healthcare and to provide all other necessary services.

The FHSD reported that the average census at sick call is 100 inmates. Inmates complained about sick call; 52% of the respondents to our survey rated it as poor and only 12% stated it was good. About half the respondents said that they experienced delays in getting to sick call some of the time. Inmates had mixed reviews of the care provided by the nurses, with many expressing the view that some nurses are responsive to inmates' medical needs while other nurses are not attentive to the inmates' concerns and do not promptly refer them to physicians for needed medical attention.

Clinic appointments with a physician or PA were even more problematic. More than three-quarters of the survey respondents reported that they experience delays in access to these

providers, and the median estimate of the delay in seeing a provider was estimated by our respondents to be 45 days. The FHSD admitted that it can take a month to see a provider for routine care. But more disturbing was the inmates' assessment of the quality of care they receive from these providers. Sixty-five percent of the inmates we interviewed rated the physicians as poor and only 7.5% considered them good. We received several complaints about the care provided by some, but not all, of the providers. These concerns included the poor attitude and lack of respect of providers when dealing with inmate-patients and failure both to address problems timely and to provide treatment for long-standing medical problems.

The inmates also raised concerns about access to specialty care and the response of the facility to recommendations of the specialists. Eighty-two percent of the respondents stated that they experienced delays at least some of the time in accessing specialty clinics, although the FHSD said he was not experiencing difficulties in getting specialists to see Great Meadow patients. Moreover, 72% of the respondents said that there was inadequate follow-up by the prison staff to recommendations made by the specialists. The FHSD was unable to comment on this issue, as he does not regularly review the consultations written by the other providers.

Concerning chronic diseases, we were disturbed to learn that only two of the 350 inmates infected with Hepatitis C (HCV) were on active treatment, an extremely low figure that strongly suggests that the prison is not aggressively pursing HCV treatment for its patients. When asked about the recent change in policy permitting prisons to provide HCV treatment to inmates who are scheduled to be discharged during the one-year time period of HCV therapy, the FHSD said that he is unaware of any patients who have been considered for this treatment. Inmates reported to us that there have been several complaints about the denial of prompt HCV treatment and that the prison has resisted providing this care. The low number of inmates on therapy supports this assertion.

Finally, we understand that the medical department has been very slow to respond to inmates' complaints about care, and it apparently has not pursued an adequate quality assurance program to self monitor its services. The FHSD confirmed that the medical unit has been backlogged in its responses to medical grievances due to the absence of an NA. Although there is a quality assurance program, he admitted that due to staff shortages, it has been difficult to maintain. Given the substantial complaints that exist about medical care at Great Meadow, we urge the prison and DOCS Division of Health Services to initiate a thorough review of the practices of this medical unit.

## Mental Health Care

Great Meadow is an Office of Mental Health (OMH) level one facility consisting of a mental health satellite unit, with a 68-bed Intermediate Care Program (ICP), a Residential Crisis Treatment Program (RCTP) and the newly established Behavioral Health Unit (BHU). The ICP services inmates whose serious mental disorders make it difficult for them to function in general population. The RCTP is intended for the temporary housing of inmates who experience mental health crises and may be a danger to themselves or others or who exhibit serious psychological problems. Inmates are confined on this unit until appropriate treatment plans and placements are

identified. The BHU was instituted for inmates with mental illness or serious misbehavior problems who are serving lengthy sentences in the Special Housing Unit (SHU).

At the time of our visit, there were 432 inmates on the mental health caseload, representing 26% of the prison population, which is one of the highest percentages of inmates on the mental health caseload we have observed at the prisons we visit. The ICP was operating at full capacity, treating 68 inmates. The RCTP's eight-bed dormitory and six observation cells were likewise fully occupied. The BHU has a capacity of 38 cells, of which 24 were occupied. Of the 69 inmates housed in SHU, 32 were reportedly on the mental health caseload.

We received mixed reviews about the mental health services from inmates in general population. Of the inmates who expressed an opinion about the program, 23% rated it as good, 39% concluded it was fair and 39% assessed it as poor. For general population inmates who were on the OMH caseload, the assessment of their mental health services was more favorable: 42% rated the services as good; 50% described them as fair; and only 8% concluded the services were poor. It is encouraging to note that the more often inmates interact with mental health staff at Great Meadow, the more favorably they tend to view the quality of the services provided. For inmates who were ever on the OMH caseload at Great Meadow, 70% knew their mental health diagnosis, 22% did not and 8% never received a diagnosis.

Inmates reported that a large percentage of inmates on the mental health caseload reside in general population, a problematic situation. Many inmates with mental illness receive minimal care for their disabilities, and some may engage in disruptive behavior or experience problems with staff and other inmates because of their disease. As a result, an excessive number of inmates with mental disorders receive misbehavior reports and/or SHU time, even though their improperly treated mental illness contributes to their inability to comply with prison rules.

### *Intermediate Care Program (ICP)*

The 68-bed ICP was full on the day of our visit. The program area was spacious and clean, and appeared to support multiple activities. The ICP inmates we interviewed seemed fairly satisfied with the program. Most residents rated the mental health services as good. Specifically, residents characterized the therapists as responsive to their needs and the groups as a useful component of their therapy. Many ICP residents believe they receive enough therapy as patients in the program. Almost all the inmates surveyed reported feeling safer in the ICP than in general population. Many told us they were more medically compliant in the ICP than in the general population and the ICP program helped them to prepare for return to the community. Many were also involved in educational, vocational or job programs, although half were not satisfied with these program assignments.

The 12 residents we surveyed were mixed in their assessments of their relations with correction officers (COs). A majority expressed a positive view of correctional staff, noting that many officers were respectful of inmates' needs and rights. But a significant minority voiced problems with the correctional staff, and several raised specific concerns about staff verbal harassment. Concerning the level of violence in the prison, four inmates reported being involved in a physical confrontation with prison staff, six stated they have been in a physical confrontation

with another inmate in the prison and five admitted that they had attempted to harm themselves while in state custody.

Overall, we were impressed with the ICP. We examined the daily schedule of activities on the unit, which appeared to contain numerous programs throughout the week. The atmosphere within the unit was calm, and the inmates seemed engaged in their program. Prison and ICP administrators should explore with ICP participants their concerns about staff treatment and assess whether verbal abuse by security staff is occurring in the program.

### Residential Crisis Treatment Program (RCTP)

We interviewed many residents of the RCTP, which consists of an eight-bed dorm and six observation cells. Several reported that they had been on the unit for one week or more. One individual reported that he had been on the unit for approximately two weeks waiting for a transfer to Central New York Psychiatric Center (CNYPC). Another inmate said that he had been in an observation cell for about three weeks and that he was hoping to be transferred to CNYPC. Lengthy stays such as these are not appropriate because the RCTP does not provide comprehensive therapy or any programs and is intended only for diagnostic evaluation of a patient, to determine what treatment is necessary and to ascertain where the patient should be confined. When we raised the inmates' claims with Superintendent Greene, now retired, he questioned whether the inmates accurately reported their times on the unit, but no specific information was provided to contradict their assertions.

### Behavioral Health Unit (BHU)

We visited the BHU, a unit to confine inmates with mental illness or behavioral problems, who are serving long-term disciplinary sentences in a SHU and who are experiencing difficulty coping in disciplinary confinement. Great Meadow offers Phase 1 of the BHU program, which is jointly operated by OMH and DOCS. Inmates who successfully complete Phase 1 are transferred to Sullivan Correctional Facility to participate in Phase 2 and eventually, Phase 3. The 38 cell unit contains two treatment areas: each with a room where inmates are enclosed in a small, barred cubicle to participate in group therapy sessions for two hours a day, four or five days a week. In addition, there is at least one individual treatment room for one-on-one treatment sessions in each treatment area.

We were surprised to learn that although this BHU has a capacity for 38 inmates, it held only 24 people on the day of our visit. Since this BHU is the entry level, meaning that all SHU inmates throughout the Department with serious mental illness or behavioral problems are eligible, we would expect significant demand for admission to this unit. We know that at other OMH level one prisons, more than half the SHU inmates are on the OMH caseload, and many suffer from serious mental illness. When we asked Superintendent Greene about the low census, he informed us that DOCS' Central Office and OMH officials had decided to limit the program to approximately this number. Given the hundreds of inmates in disciplinary segregation with serious mental illness who are not receiving adequate mental health care, we consider this decision inappropriate. We learned that in the few months prior to our visit, there were several changes in OMH personnel. We suspect that this lack of stability in treatment staff has

contributed to the limits on the BHU population. We hope that these personnel problems are resolved and the unit is fully occupied.

Although OMH officials would not speak to us, we did interview many residents and received detailed surveys from 14 inmates. Their responses present a mixed review of the program.

The respondents to our survey had extensive prison and disciplinary segregation experience. They had been in prison a median of 10 years and have median disciplinary sentences of three years. More than 90% of the respondents have been placed on deprivation orders while in the SHU and half were on a restricted diet prior to being sent to the BHU. Five respondents reported that they had been admitted to an RCTP since being incarcerated, including three who had been sent to the RCTP multiple times since being in the SHU. Two respondents had been to CNYPC. Three-quarters of the respondents knew their mental health diagnosis, and most were on psychotropic medication.

Mental health services are provided to BHU residents primarily in group therapy sessions, which are generally held five times per week in one of the two rooms containing six small caged booths in which participants are placed for the two-hour therapy sessions. These small cages are not conducive to effective treatment. We urge DOCS and OMH to discontinue their use and to institute a procedure where BHU security and mental health staff determine whether the behavior and disciplinary history of each BHU participant justifies some form of restraint during group therapy sessions. We do not believe that security staff has to be present during group therapy sessions where inmates are not secured in cages, as is demonstrated by the lack of disruption in group therapy activities in the Sullivan BHU and at CNYPC, where there are no cages. The group therapy rooms at Great Meadow are in very secure locations, and if the cages were no longer used, OMH and DOCS staff would have the option to have someone restrained if they felt that his behavior warranted such action.

The inmates expressed a somewhat favorable view about the mental health services. Twenty-five percent of the BHU respondents described them as good, 58% rated them as fair and 17% considered them poor. The respondents reported that they generally are in four to five group sessions a week, and most sessions contain four or five participants. Most BHU survey respondents stated that they also have individualized treatment sessions once per month; two reported having them twice a month and one had them weekly. Most respondents reported that these individual treatment sessions were about thirty minutes or shorter, but a few reported sessions of one hour or more. Approximately 30% of the respondents said they experienced some problems with their psychotropic medication. More than half the survey participants reported having some relapse since they have been on the unit. Overall, the level of mental health services is significantly greater than for SHU inmates, and we believe these services are beneficial for most residents.

In contrast to their assessment of the mental health services, the BHU respondents were more critical of their treatment by the security staff. More than 40% reported that relations with correction officers were bad; 33% stated their relations were equally good and bad; and only 25% considered them good. More than half the respondents have had a physical confrontation

with staff at Great Meadow, and all but one inmate reported verbal harassment by staff while at the prison. (This was the category of officer misconduct most commonly experienced by the BHU residents.) Most BHU residents noted other common forms of abuse: threats and intimidation; turning off cell lights or water or being denied services; retaliation for filing complaints; and false misbehavior reports. More than half the respondents said they frequently felt very unsafe at the prison.

More generally, BHU respondents reported that security staff exercise excessive control over the unit and undermine the mental health staff who attempt to help them. Several told us of conflicts between security staff and mental health providers, and inmates believe that some mental health staff have left the unit because of the lack of support from the security team. BHU inmates were particularly upset about the verbally aggressive manner of the correctional staff, who, they told us, are quick to issue misbehavior reports for any confrontational or inappropriate behavior, regardless of the circumstances. This assertion is confirmed by our survey data. At least half the BHU respondents have received tier III misbehavior reports on the unit, and consequently, have received additional SHU time. This frequent application of disciplinary sanctions contradicts the premises for establishing the unit, namely, that the inmates' mental illness is a factor in their misbehavior; that therapy, rather than punishment, should be employed to effect change; and that SHU sentences should be reduced. It appears, however, that security staff are applying the punitive response to inmate misconduct typically utilized in the Department's SHUs. Although many BHU inmates have an extensive history of misconduct, to improve the inmates' behavior, appropriate treatment and flexibility, rather than rigid applications of prison rules, must be employed.

This BHU is a restrictive environment with little out-of-cell time and limited activities. Although the inmates have two hours of therapy each weekday, they are still in their cells for almost all of the remainder of the day. Recreation is allowed for one hour each day for most residents, but only half our respondents chose to exercise frequently: 31% go to recreation only once in a while; and 23% almost never go. Some inmates expressed reluctance to go to recreation due to officer harassment and fear of other inmates. Only two respondents were involved in cell study programs. Half were dissatisfied with the in-cell reading material. There are incentives that BHU residents can obtain, including headphones, an extra shower or longer recreation, but the latter is only approved for those inmates who are actively participating in therapy and therefore, likely to graduate from the program. Less than half the respondents reported receiving any incentives and the incentives the survey respondents were granted did not consist of more out-of-cell time or increased programming. Committee members judged that the unit was being run very much like other SHUs, and results of our survey confirmed this impression. We question why only two hours of therapy a day are provided to Phase 1 inmates, whereas Phase 2 and 3 BHU participants receive four or more hours of programming daily and additional opportunities to be out of their cells. Phase 1 participants are inmates in the greatest need of therapeutic intervention to help them change their behavior and the overall operation of the unit makes that task difficult for inmates who do not cope well in solitary confinement.

It seems clear that many BHU participants will have difficulty completing Phase 1 of the program and therefore will not be eligible for transfer to Phase 2. A majority of our survey respondents appeared to experience problems in the program. Although we understand that

program officials anticipated that it would generally take six months to complete Phase 1, many inmates we surveyed had been in the program for longer periods. Moreover, several others, who have been on the unit less than six months, have been convicted of tier III violations and sentenced to additional SHU time – behavior that will generally disqualify them from completing Phase 1 for at least an additional 90 days. If individuals continue to receive misbehavior reports, it is likely they will either be removed from the BHU program entirely or left for extended periods in the restricted condition of this Phase 1 program. Overall, we conclude that a significant number of current BHU residents will not be transferred promptly to Phase 2, but rather will languish in Phase 1 accruing additional SHU time.

We urge prison officials, DOCS Central Office and OMH staff to reevaluate the approach of correctional staff to Phase 1 inmates. We strongly endorse the provision of meaningful therapy to this population. However, we did not detect sufficient coordination between the mental health and security staffs to create and sustain the therapeutic and supportive environment needed to alter the behavior of inmates with extensive disciplinary and mental health problems. Misconduct by BHU residents should be addressed with more effective techniques, rather than by the repeated imposition of disciplinary sanctions. It is unclear, for example, if, for inmates who are violent or attempt self-injury, the prison is utilizing Dialectical Behavior Therapy, which has been particularly effective for patients with Borderline Personality Disorder and Antisocial Personality Disorder. After one year of operation, security and mental health staff should provide greater support for the inmates and consequently more inmates should successfully complete Phase 1.

## Programs

Educational, vocational and treatment programs provide inmates important opportunities to learn valuable skills and overcome problems, cultivating safer, more manageable prisons and increasing the likelihood that participants will be successful upon their return to the community. Approximately 66% of Great Meadow's inmates are in a program for the full day, an additional 10% are in programs for half the day and 15% have no program assignment. Nearly 11% of inmates are assigned to a porter position, work that often involves performing menial tasks and does not generally lead to the development of useful skills. At Great Meadow, it appears that more inmates are in programs than at many other facilities, and we were pleased to hear the staff's assessment that the administration has been aggressive in increasing programmatic enrollment and staffing. All of Great Meadow's 109 inmates who are under 21 years of age are enrolled in a program.

### Educational Program

Nearly 300 inmates are enrolled in one of Great Meadow's educational classes, which include Adult Basic Education (ABE), Pre-General Equivalency Degree (Pre-GED), GED, English as a Second Language (ESL) and a special education class specifically for inmates under 21. Over 1,000 inmates are on a waiting list for an educational program, demonstrating a great need for expansion of the educational services at the prison. On the day of our visit, eight of Great Meadow's ten instructor positions were filled and 278, or 17%, of Great Meadow's

inmates were enrolled in an educational program. We were pleased to note that the facility has a computer lab that students from each class attend every other week.

Inmates had mixed reviews of the educational program at Great Meadow. We spoke with a number of individuals who described the educational program as "the best thing about Great Meadow" and commented positively about both their classes and the teaching staff. In spite of the exceptionally long waiting lists, most inmates who were already in an educational program reported spending little to no time on waiting lists before enrolling.

However, of the 69 inmates surveyed who were in an educational program or had been in one within the past year, 49% said they were not satisfied with the program. Some inmates expressed concern that there is not enough help in school for the people who need additional tutoring or assistance. Inmates also complained that the books and learning materials were outdated and culturally irrelevant. We also heard complaints about a policy that prohibits inmates from going to the bathroom during class periods. Finally, we spoke with a number of inmates who said they felt classes were too large and crowded. The educational supervisor also commented that more teachers would be useful, but she stated that they were "getting by" nonetheless and described the current staff as "a great group of teachers."

We were pleased to learn that 33, or 73%, of the 45 inmates who took the GED exam in 2005 passed, a significant increase compared to the 10 inmates, or 33%, who passed in 2004. The educational supervisor attributed the improvement to the addition of a daytime GED class and stability in the staffing of the educational program.

In spite of this admirable pass rate, over 50% of Great Meadow's inmates have no High School Diploma or GED; many more inmates should take the test and pass each year. Moreover, for the 819 inmates who have their High School Diploma or GED, there are very limited postsecondary opportunities. At the time of our visit, there were no inmates enrolled in any postsecondary education programs. The educational supervisor explained that while college correspondence courses are available, inmates have to order books through the package room and pay for materials prior to beginning the course, so few inmates utilize the program. Given the success of the current educational program in generating GED graduates and the significant number of inmates with high school diplomas, we urge the prison to seek meaningful postsecondary educational opportunities for its population.

We were pleased to learn that there are a number of educational services for Spanish-speaking inmates at Great Meadow. The facility has one bilingual teacher, assisted by a Spanish-speaking Inmate Program Associate (IPA), and offers ABE, GED, and ESL classes for Spanish-speakers. In addition, cell study is available for Spanish speaking inmates who are in disciplinary segregation.

At the time of our visit there were nine inmates in disciplinary segregation enrolled in a cell study program, with no one on a waiting list. Offering educational opportunities for inmates in the SHU enables them to participate in productive and enriching activities while serving their disciplinary sentence, potentially easing their return to the general population and preventing further disciplinary problems.

### *Vocational Program*

On the day of our visit, 372 inmates were enrolled in a vocational program and 91 were on a waiting list. Great Meadow's vocational shops, which include some newly added programs, are Welding, Print Shop, Masonry, General Business, Floor Covering, Electrical Trades, Drafting, Building Maintenance, Computer Operator, Food Service and Small Engine Repair. We were pleased to note that the facility offers eight Department of Labor Apprenticeships for inmates to gain official certification in a trade.

Eleven of the facility's twelve instructor positions were full at the time of our visit. With no Spanish-speaking instructors, inmates who do not speak English rely on other inmates for translation. At least one IPA who has completed the program works in each vocational shop to assist the instructor and the students, and each instructor also names an inmate to act as a rotating "tool man" to organize and distribute tools for the participants.

Inmates receive certificates from DOCS for successfully completing their vocational programs. Some inmates told us that certificates are placed in their files, but they do not always receive copies. Inmates acknowledged that receiving these certificates and other recognition upon completing their courses would be useful in motivating their participation. Implementing such measures would provide simple and inexpensive incentives for vocational participants.

According to the Vocational Supervisor, about 70 inmates are removed from their vocational programs each year, usually as a result of testing positive for drug use. After they are removed, inmates must be placed on the waiting list in order to return to their program.

Inmates with mental illness, including those who participate in the Intermediate Care Program, are permitted to participate in vocational programs. They are commonly enrolled in programs like Custodial Maintenance, which require a relatively low skill level. According to the Vocational Supervisor, instructors monitor inmates with mental illness to prevent disruption and to ensure that they are engaged in their work.

Of the inmates we surveyed who are currently in a vocational program or had completed one in the past year, 60% reported that they are satisfied with the program. In conversations with inmates throughout the day, we heard many positive comments about the vocational program, although some expressed a desire for updated equipment and for skills that are more relevant to the work they will seek in the urban communities to which they will return. The vocational supervisor said he is pleased with the equipment in the vocational shops and informed us that the state had recently made a large allocation for the prison to purchase new materials, which he looked forward to receiving shortly.

## Safety and Violence

### *Staff-Inmate Relations*

The Visiting Committee identified a very high level of tension among the inmates and staff, with many inmates describing disrespectful and abusive behavior by security staff and an

atmosphere of pervasive fear at the prison. Some inmates described the correction officers as "provocative" and themselves as frustrated and fearful. Among the most common forms of abuse cited by the inmates were physical assault, verbal harassment, threats and intimidation, retaliation for filing grievances, abusive pat frisks and racial harassment. Of the 121 inmates who responded when asked to describe inmate-officer relations 77% told us relations are bad at Great Meadow. In addition, although we had conversations with inmates who told us that the atmosphere is not as tense as other prisons, 66% believe that inmate-officer relations at this prison are worse than at other facilities.

Inmates described the verbal harassment by COs as cursing and yelling at inmates, even for routine orders. Of the inmates we surveyed, an alarming 85% reported that they had personally experienced verbal harassment by COs frequently or once in a while, and 90% believe that it occurs frequently throughout the facility.

Pat frisks, according to inmates, are often conducted in an abusive manner, characterized by an invasive touching of the rectal and testicular areas. Forty-eight percent of the inmates we interviewed reported that they experience abusive pat frisks frequently or once in a while, and 43% stated that the practice is common throughout the facility. One inmate who is subject to frequent frisks called the procedure "degrading and depressing."

Another troubling finding was that physical assaults by staff on inmates appear to be relatively common. Of the inmates we interviewed, 28% reported experiencing a physical confrontation with Great Meadow staff at least once and 86% stated that physical confrontations between staff and inmates occur frequently or once in a while. Fifty-five percent of the inmates we interviewed reported that the level of inmate-staff physical confrontations is worse at Great Meadow than at other facilities, although 34% believe the level is about the same as other prisons.

According to inmates, physical assaults occur most often on the cellblocks, in the sergeants' offices or in the auditorium. When cameras have been installed in these areas, inmates told us that they are never set to record the incidents, functioning instead as closed circuit surveillance. Many inmates are reluctant to report incidents of staff abuse, fearing retaliation and doubting the likelihood that staff will be disciplined as a result. Supervisors, the inmates reported, routinely support the officers' versions of incidents and file paperwork mirroring the officers' reports without adequately investigating the inmates' claims. Moreover, inmates who witness acts of abuse are sometimes intimidated from testifying on another inmate's behalf and some witnesses have been transferred out the facility shortly after an incident. The following graph illustrates inmates' responses to questions about their personal experiences with COs at the prison.

**Incidents Experienced by Great Meadow Survey Respondents**

**Involving Staff Conduct**



In general, inmates feel threatened by the officers, many of whom, inmates report, walk around the facility swinging their batons and addressing inmates aggressively. Since Great Meadow is closer to New York City, where many inmates are from, than many other maximum security facilities in the State, inmates fear a transfer that would move them further away from their families and therefore are reluctant to file complaints about or object to staff misconduct. Our survey responses demonstrate the high level of inmate discomfort, with 64% of the inmates reporting that they frequently feel unsafe in the prison; of those who ever feel unsafe, 60% feel very unsafe.

It is notable that although there were bitter complaints about some members of the staff, 90% of inmates stated that there are also staff who are respectful and professional at the facility. Some staff, the inmates reported, are willing to confront abusive staff when they witness misconduct, but most, they further stated, are reluctant to challenge their coworkers and generally turn a blind eye to the abuse. The respondents' median estimation of the percentage of COs who engage in serious misconduct was 65%, while the median estimation of COs who do a good job was only 25%.

Only 15% on the inmates we interviewed stated that the administration prevents abuse by staff, yet some inmates noted that the prison executives are doing their best to curb abuse. They further told us that COs are resisting administrative measures to create a safer environment in the prison.

Some inmates attributed the tense atmosphere in the facility to the lack of sufficient supervision of the COs. Others noted that inexperienced staff generally tend to be more strict and aggressive than their more senior counterparts, and Great Meadow, an on-the-job training facility, has a significant number of new officers. Finally, with a staff that is 3% white responsible for managing an inmate population that is 78% men of color, racial tension inevitably plays a role in the facility's atmosphere. Indeed, 67% of inmates reported that racial tension is common at the prison, and only 2% stated that there is none at all. Similarly, 81% reported that racial tension contributes "a lot" or "somewhat" to abuse at Great Meadow and only 1% responded that it is not a factor in abuse problems at the prison.

### Inmate – Inmate Relations

Although some inmates told us that relations among inmates at Great Meadow are relatively calm, others disagreed, telling us that violence and conflicts arise among inmates as a way to vent frustration with the generally tense atmosphere in the facility. Some noted that inmates who have already spent many years in the system are more adjusted to prison life, in contrast with recently admitted individuals, who cause most of the disturbances. Our survey responses indicate that Great Meadow's inmates engage in a high level of violence with each other.

Of the inmates we interviewed, 40% reported involvement in a confrontation with another inmate at Great Meadow, one of the highest levels of inmate-on-inmate confrontations of any prison we have examined. Furthermore, 68% of the respondents believe that physical confrontations between inmates occur frequently at Great Meadow. Forty-seven percent of respondents reported that inmate-on-inmate confrontations are worse at Great Meadow than at other prisons, and only 10% reported that the level of confrontations was better. According to the respondents, gangs, drugs and personal conflicts are the factors that most commonly contribute to this violence. When asked if staff is involved in encouraging the confrontations or permitting them to occur, 56% reported that this kind of misconduct happens frequently or once in a while and only 25% stated that it does not occur.

Inmates told us that gang activity is a major factor causing inmate-on-inmate violence at Great Meadow. An alarming 85% reported that such activity is very common, while none stated that it does not exist at the prison. Moreover, 84% of the inmates we interviewed told us gangs contribute "a lot" or "somewhat" to violence in the prison, and only 3% stated that gang activity does not contribute at all to violence at Great Meadow. In contrast, Superintendent Greene expressed the view that gangs, or unauthorized groups, contribute very little to violence in the prison.

Drug activity appears to be less prevalent than gang activity at the prison, with 46% of inmates reporting that it is common. Inmates had mixed responses about whether drugs were a source of violence at the prison, with 29% stating that drugs contribute "a lot" to violence, while 42% reported that drugs contribute "very little" or "not at all" to violence. Although Superintendent Greene agreed that drugs at Great Meadow are a problem, he did not believe that they contribute significantly to violence in the prison.

### *Cameras*

Cameras that are monitored by staff and record events for future review can protect both staff and inmates by deterring inmates and staff from participating in disruptive incidents, increasing surveillance so that a more timely response can be mounted when a disturbance occurs and resolving issues of responsibility for the disturbance after the incident is over. Seventy percent of the inmates we interviewed told us that additional cameras would make the prison safer.

## Grievances

During our visit we spoke with a number of inmates who voiced concerns about the grievance system. Inmates reported being discouraged by staff from issuing complaints and being compelled to withdraw grievances because of intimidation from supervisors and fear of retaliation from COs. Inmates also complained that grievances are sometimes intentionally miscoded to minimize the number of Code 49 grievances, which are about staff misconduct. In addition to experiencing problems when filing complaints about staff conduct, inmates also reported that complaints about medical care are rarely upheld and that it sometimes takes months to receive a response from the medical staff.

Of the inmates we surveyed, 74% described the effectiveness of the grievance system as poor, and 42% said the grievance system was much worse at Great Meadow than at other facilities. Of the inmates who filed a grievance, sixty-five percent said they experienced retaliation for using the grievance system. Inmates told us that the retaliation takes the form of denying recreation and meals and threats of physical force.

## Packages

Inmates throughout the facility complained bitterly about Great Meadow's package system. Of the inmates we surveyed, 65% told us they were not satisfied with the program. Consistent with state policy, inmates opted to have televisions in their cells and, in exchange, they are entitled to receive only two packages of food per year, although they may purchase items from vendors approved by the prison. Many of the inmates' complaints focused on the prison's inconsistent interpretations of the state package directive. Although Superintendent Greene said that the package directive is displayed prominently throughout the facility, there remains a high level of frustration and confusion about the policy. We also heard many reports of lost or damaged packages.

## Libraries

### *General Library*

The library at Great Meadow is open two days and two nights a week. It has a computerized card catalogue and is part of in an interlibrary loan system, through which inmates can receive books from other libraries. We spoke with the librarian who told us that the prison has a large, and extremely popular, collection of books by African-American authors. She also

said that she has been working to build up the Spanish section, which consists of one set of shelves and a small reference section.

Of the inmates we surveyed, 44% said that they were not satisfied with the general library. The biggest complaint from inmates was that they have to wait between one to two months to visit the library after they have put in a request. The librarian told us that the department is looking to hire a part-time staff person so that the library can remain open on weekends and on additional evenings. Inmates told us that the problem could also be alleviated if the inmate clerks who work in the library were provided additional training, enabling them to distribute books with the supervision of a CO while the librarian is not at the facility. There were also complaints from inmates that many of the books are out of date.

### Law Library

Inmates had mixed reviews of the law library. There does not seem to be the same problem of access to the law library that there is with the general library. The officer in charge of the library told us that the space was recently expanded, allowing for greater inmate access, and that inmates can usually gain access a day or two after they put in a request. The law library has a total of 20 inmate clerks, including five who are Spanish-speakers.

Of the inmates we surveyed, an impressive 75% said they were satisfied with the law library at least some of the time. Although staff informed us that publishers ship updates to case materials to the prison as soon as they are released, inmates told us that the improvement most needed in the law library is the inclusion of more rapidly updated legal materials. Some inmates complained that some typewriters are broken and also expressed the need for new computers.

## Visiting Room

Nearly three-quarters of the inmate survey respondents reported dissatisfaction with the visiting program. Inmates complained that the visiting room is too small and has not been renovated properly to accommodate the needs of the expanding inmate population. Additionally, they complained that there are times when they stay in their cells awaiting a visit and the officers do not call them, claiming they were unable to locate the inmate. Some inmates also reported that the COs who work in the visiting room are disrespectful to visitors.

Superintendent Greene informed us about the plan to upgrade the visiting room. He mentioned that the seating arrangement will be changed, but not expanded. We hope that the new arrangement will alleviate some of the current problems, but given the large prison population, expanding the size of the visiting room should receive consideration. In response to the inmates' complaints regarding delayed visits, the Superintendent told us that visits are seldom cut short or denied, and that the visiting room is full only during major holidays.

## Special Housing Unit

Great Meadow has two Special Housing Units (SHUs) which were at full capacity, confining 69 inmates on the day of our visit. In addition, there were 113 inmates on keeplock

status, raising concerns about whether some inmates are placed on keeplock for long periods of time and receive insufficient treatment or services since they are not in the SHU. Correctional Association visitors went to one of the SHUs and found it to be unclean, with the residents complaining about the physical conditions on the unit and their treatment by staff.

Only nine inmates on the units were participating in an educational cell study program when we visited. Cell study offers inmates a valuable, if limited, opportunity to participate in a constructive activity while inmates serve their disciplinary sentences. We commend the facility for making cell study materials available in Spanish.

We were disappointed to learn that two inmates were on the restricted diet when we visited, and two SHU inmates we interviewed had previously been given the punishment, known as "the loaf," while in Great Meadow's SHU. Along with the American Correctional Association, we have long advocated an end to the policy of using food as punishment, as it is inhumane and ineffective in curbing misbehavior and leads to weight loss and nutritional problems for many inmates. In addition, one inmate we met had a ten year disciplinary sentence, indicating that his behavior problems were being addressed ineffectively by repeatedly adding time to his SHU sentence. Such lengthy sentences can cause extensive psychological and physical harm and illustrate the need for programs to help inmates overcome their disruptive behavior and return to the general population, as the BHU is intended to do.

Inmates reported that relations with staff were very bad in the SHU and mentioned threats and intimidation, destruction of property, denial of recreation, abusive pat frisks and racial harassment among the types of abuse they commonly experienced on the unit.

We were also disappointed to learn that 32, or nearly half, of the inmates in the SHU were on the OMH caseload, a rate that is almost double the rate for general population inmates. Disciplinary segregation is a mentally harrowing experience for any individual, but for people with mental illness, 23-hour isolation can be truly agonizing, leading to psychiatric deterioration, self-harm or even suicide. Placing individuals who suffer from serious mental illness in the SHU is a harsh and ineffective practice. Options should be established that are not only more humane, but also more successful in preventing disruptive behavior and creating a safer and more manageable prison.

### Alcohol and Substance Abuse Treatment

Great Meadow runs three Alcohol and Substance Abuse Treatment (ASAT) programs, with a total enrollment of 96 inmates. Program aides, under the supervision of a correction counselor, facilitate the classes. Inmates in the program live together on a housing unit reserved for participants. In addition, 16 BHU inmates participate in an ASAT program that is facilitated by a counselor on their unit. Approximately 100 inmates successfully completed the program in 2004 and 2005 and 20 had graduated in 2006 at the time of our visit. Unfortunately, more inmates have been removed from the program than completed it. During the years 2004, 2005 and 2006, 187, 208 and 156 inmates, respectively, were removed from the program. Removal numbers approximately double the numbers of graduates are much worse than at other prisons

we have visited, strongly suggesting that the Great Meadow program is not adequately engaging a majority of the participants or assisting them in dealing with their substance abuse problems.

Members of the Committee visited two of the general population ASAT classes, which had bare walls, with no information posted relevant to the inmates' treatment. Some inmates told us that the class is very good and made favorable comments about the instructors and the curriculum. Of the 24 people we surveyed who are currently in ASAT or who had completed the program within the past year, 46% were satisfied with the program and 21% found the program satisfactory "sometimes or somewhat."

There are no materials or instruction available in Spanish for ASAT participants. Spanish-dominant inmates we met with told us that although they value the class, they struggle to understand the material and would gain more from a class that was either conducted in Spanish or that provided resources to help them better understand English.

We did not learn the exact number of inmates on the waiting list, but the inmates and instructors with whom we met confirmed that the waiting list, which prioritizes inmates who are closest to their release date, is very long. Inmates told us they were on the list for between six months and three and a half years before beginning the program.

Although there are two units where only ASAT participants are housed, the program falls far short of a therapeutic community, where a supportive treatment environment would be engendered outside of the classroom. There is no area on the unit for inmates to meet and discuss their substance abuse problems, and no opportunity for participants to work together and assist each other in addressing their addictions.

Inmates who are closest to their earliest possible release date are prioritized for admission to ASAT, and those who have been identified by DOCS as having a substance abuse problem (73% of New York's total prison population) are often denied parole until they have completed a substance abuse treatment program. In the program and throughout the facility, inmates recounted frustrated stories about the method by which inmates are chosen to participate in the program. Some informed us that they had been identified by the Department as having a substance abuse problem because they admitted to smoking marijuana briefly in the past, and although many years may have past since they used the drug, they had no chance of being released on parole until they complete a program for which they have no need. Some inmates reported that they have languished on a waiting list for years and have been repeatedly denied parole because there was no room for them in ASAT. Others admitted to us that they suffer from addiction and face repeated disciplinary sanctions as a result, but since they have many more years to serve before going to the parole board, they are not eligible for ASAT. One inmate with a very long sentence told us that he had been informed that he would have to wait over 30 years to be placed in ASAT. Another showed a visitor numerous misbehavior reports that had led to multiple SHU sentences over the course of many years and painfully asked, "I know I have a problem, why won't they let me get treatment?" It is clear that there are many inmates in need of treatment who are not in the program, and some who take up needed spaces in ASAT because it is required for their release do not have a substance abuse problem.

## Meeting with Staff

We regret that although we requested sessions with each staff union, only one representative of one union agreed to meet with us. The experience and perspectives of the staff are crucial to our understanding of the strengths and deficiencies at a prison. Although we had an interesting and frank discussion with the individual with whom we met, this letter would be more complete if it also included the points of view of the rest of the staff. Particularly important are security personnel who work at Great Meadow and have information and opinions about what is working effectively within the prison and what difficulties they encounter in managing and providing services to the inmate population.

## Final Meeting with Executive Team

At the end of our visit, we met with Superintendent Greene and the executive team to discuss our observations. We noted our positive impression of the vocational, educational and industry programs and the Intermediate Care Program. We also raised our concerns that staff vacancies adversely affect medical services. He told us that he has been making extensive efforts to recruit additional nursing staff and that he defers most decisions about healthcare supervision to medical experts.

We discussed the tense atmosphere in the facility and issues of safety and violence. We told him we heard reports of verbal harassment, abusive pat frisks and physical assault of inmates by staff. He told us that although he receives periodic complaints about such incidents, he believes there are fewer such problems than in the past. He added that Great Meadow staff conduct many pat frisks, which are unpleasant because they are necessarily invasive, but that they make the facility safe for inmates and staff. He also told us that if he notices that there are repeated problems or complaints about a particular staff person, he asks the supervisor to counsel the staff member, but that he only moves a staff person from a position if he can verify, with a great deal of certainty, that there is a problem. He told us that he does not believe that gangs, or unauthorized groups, are major problem in the facility, although they sometimes cause violence to flair up. Similarly, he told us that drugs among the population are a problem, although he doesn't believe they cause a significant amount of violence.

We also reported widespread frustration among inmates about the package room, and Superintendent Greene told us that he believes inmates should understand the policy since the directive is very clear and has always been followed at the prison.

When we mentioned that inmates said that some grievances are miscoded intentionally by staff in order to create the appearance that there are fewer staff misconduct grievances than have actually been filed, he disagreed. He also mentioned that there are a small number of inmates filing a disproportionate number of grievances, and that some staff are better than others at resolving issues informally.

The following is a summary of the Visiting Committee's recommendations:

## Recommendations

### *Medical Care*

- The Superintendent and medical administrators should meet with the ILC to discuss the problems with medical care and review the medical grievances during the last six months to assess patterns of complaints about healthcare at the prison.

- Hire additional healthcare providers and fill the vacant nursing items, including the Nurse Administrator position. If the nursing items cannot be filled promptly, DOCS Division of Health Services (DHS) and the Division of Budget should take action to enhance the salary scale for these positions.

- Conduct sick call five days per week, instead of only four, and review the quality of the sick call encounters to determine whether all sick call nurses are adequately addressing the inmates' medical needs.

- Reduce the time it takes for inmates to be seen by prison providers and institute a review by DOCS DHS staff of the quality of these medical encounters.

- Improve the timeliness of specialty care appointments and initiate a review of completed consultations to determine whether there has been adequate follow-up to the recommendations made by the specialists.

- Initiate a review by DHS personnel of the care provided to inmates infected with Hepatitis C to determine whether some inmates should be considered for treatment and to assess whether care has been provided in a timely manner.

- Review the medical department's responses to inmates' medical grievances to ensure that the grievances are properly investigated and promptly responded to by the medical department.

- Enhance the facility's quality improvement program to ensure that all medical systems are regularly reviewed and that medical staff promptly remedy any identified problems.

### *Mental Health Care*

- Provide additional residential mental health treatment for general population inmates with serious mental illness by expanding the ICP program at Great Meadow and other DOCS facilities.

- The Superintendent and the supervising mental health staff should meet with the ICP inmates and review their grievances to assess their relations with security staff. In particular, assess whether staff verbal harassment occurs and, if so, identify the sources of this behavior and take corrective action.

- Review the length of stays of inmates confined in the RCTP during the last six months. If stays of more than a few days are identified, assess the reasons for these stays and, along with DOCS Central Office and OMH staff, develop a corrective plan to ensure that staff can diagnose RCTP patients, develop treatment plans and transfer patients to appropriate treatment facilities in a timely manner.

- Discontinue use of the caged treatment units for group therapy in the BHU and institute an individualized determination for each patient about whether restraints during group therapy sessions are appropriate.

- Develop effective mechanisms to address inmate misconduct other than additional disciplinary sanctions and provide additional staff training and monitoring to ensure that these mechanisms are properly implemented.

- Reassess the mental health and behavioral treatment programs utilized in the BHU to determine whether to incorporate a Dialectical Behavior Therapy model.

- Review the records of recent BHU inmates who have remained on the unit for more than six months, have been removed from the BHU program due to misconduct or have received multiple tier III violations. Convene a meeting of BHU security and mental health staff to discuss these cases to assess why some individuals were unsuccessful in the program and whether the program can be altered to increase the percentage of BHU residents who complete the program.

*Educational Program*
- Institute post-secondary educational options.

- Increase the capacity of the GED program.

- Fill the vacant instructor positions and increase the number of teachers in the educational program.

*Vocational Program*
- Provide inmates with copies of their certificates and other incentives upon successful completion of a vocational program.

- Fill the vacant instructor position.

- Improve the capacity of the vocational program to provide training to Spanish-speaking inmates by providing written materials in Spanish and by employing IPAs who are bilingual.

*General Library*
- Hire additional staff or train inmates to work in the library so that it can remain open for additional hours.

- Increase the fiction and nonfiction Spanish reading material.

### *Law Library*

- Acquire Westlaw on CD Rom or some other system to enable inmates to perform computer-based legal research so inmates can obtain legal materials in a timely manner.

- Obtain updated computers for the law library.

### *Alcohol and Substance Abuse Treatment*

- Reevaluate the program's curriculum and processes to implement more effectively a modified therapeutic community model, including establishing activities in the inmates' housing area.

- Evaluate the criteria for requiring substance abuse treatment so that only individuals in need of the program are assigned to it.

- Introduce measures to accommodate Spanish-dominant inmates, such as bilingual teachers and materials in Spanish.

- Reassess the criteria for removing inmates from the program and screen the files of inmates recently removed from the program. These steps should help determine whether the program can be altered to reduce the number of removals by more effectively engaging participants in the curriculum and by addressing inmate misbehavior in ways that will curtail the misconduct but not require program removal.

### *Packages*

- Conduct a review of the procedure by which packages are distributed to inmates and provide each inmate in the facility with copy of Directive 4921.

### *Inmate-Staff Relations*

- Institute a training program for staff to engender increased sensitivity.

- Institute efforts to increase the diversity of Great Meadow's staff by recruiting and hiring Spanish-speaking and African-American correction officers and additional female correction officers.

- Install cameras that record throughout the facility, particularly in areas where conflicts are most common, and ensure that they are consistently turned on and utilized.

- Establish a mentoring program in which senior correction officers are assigned to train and mentor junior officers about communicating with inmates in a respectful and constructive manner, to avoid confrontations and to defuse situations that could lead to inmate misbehavior.

*Special Housing Unit*
- Prohibit placing inmates with serious mental illness in the SHU and assign them instead to residential treatment programs.

- Ensure that both SHUs are clean and sanitary.